UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

| | |
|---|---|
| VERA R. DIFILIPPI-ABOELELAA,<br>(an individual)<br>And her husband,<br>Ibrahim Aboelelaa<br>(an individual)<br>Plaintiffs,<br><br><br><br><br>-against-<br>BROOKLYN PUBLIC LIBRARY SYSTEM<br>(an organization),<br>Sarah Weiss<br>(an individual),<br>Fortune Cohen<br>(an individual),<br>Gerald Radioli<br>(an individual),<br>Victor Ferrer<br>(an individual),<br>Mary Maldonado<br>(an individual),<br>Edward Jelen<br>(an individual),<br>Linda Cohen Portera,<br>(an individual),<br>William Sennick<br>(an individual)<br>Dionne Mack-Harvin<br>(an individual)<br>Mary Graham<br>(an individual)<br>And John Does Numbered 1-25<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: Civil Action No.<br>: 08 CV 4323<br>: (JSR)<br>: **AMENDED COMPLAINT AND**<br>: **JURY TRIAL DEMAND**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

------------------------------------------

Plaintiff Vera Difilippi-Aboelelaa (hereinafter "Plaintiff Difilippi") and her husband, Plaintiff Ibrahim Aboelelaa (hereinafter "Plaintiff Aboelelaa") as and for their complaint, by their undersigned counsel, allege as follows:

### INTRODUCTION

1.     This is an action to remedy violations of the rights of Plaintiff Difilippi under The Americans with Disabilities Act of 1990, The Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, and various employment and

- 1 -

tort statutes and common laws of the State of New York. Having worked for 24 years as an employee for Defendant Brooklyn Public Library System, Plaintiff Difilippi was subjected to discrimination on the bases of age, disability (including their failure to provide reasonable accommodation), and religion at the hands of Defendant Brooklyn Public Library System and its agents, namely Defendants Sarah Weiss, Fortune Cohen, Victor Ferrara, Mary Maldonado, Edward Jelen, Linda Cohen Portera, William Sennick, Mary Graham, and Gerald Radioli(collectively hereinafter "the Individual Defendants").

2. Within the scope of their employment with Defendant BPLS, and with the (actual and/or constructive knowledge of Defendant BPLS, the Individual Defendants also engaged in such outrageous conduct as to have collectively and/or separately committed intentional infliction of emotional distress, and prima facie tort against both Plaintiffs, Difilippi and Aboelelaa, and assault, battery, defamation against Plaintiff Difilippi.

## JURISDICTION and VENUE

3.     The Jurisdiction of the Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343(4).     This Court's pendent jurisdiction is also invoked pursuant to 28 U.S.C.A. § 1367.

4.     The unlawful employment practices and other tortuous violations alleged herein were committed in whole or in part within the State of New York.

## PARTIES

5.     Plaintiff Difilippi, who resides at 1774 58th Street in the Borough of Brooklyn, in the City and State of New York., became employed by Defendant Brooklyn Public Library System (hereinafter "BPLS" or "Defendant BPLS") on August 1, 1983. She served most recently in the job of Office Associate III, from November of 2006 through October 19, 2007, when she was removed from her employment duties by Defendant BPLS.

6.     At all relevant times herein, Plaintiff Difilippi was an "employee" of Defendant BPLS within the meaning of 42 U.S.C.A §§ 2000e, et seq., 42 U.S.C.A. §§ 12101 et seq., 29 U.S.C.A. §621, et seq., and all relevant New York state statutes and common laws, including, but not limited to N.Y.C. Admin. Code §§8-107(1)(a) and (15)(a).

7. Plaintiff Aboelelaa, who also resides at 1774 58th Street in the Borough of Brooklyn, in the City and State of New York, is the legal husband of Plaintiff Difilippi and has been since December 30, 1999. Plaintiff Aboelelaa and Plaintiff Difilippi have cohabitated as husband and wife continuously throughout their marriage and continue to do so to date.

8.    Defendant BPLS is, upon information and belief, a quasi-public New York non-profit organization which is supported by public funds from the federal, state, and local governments, as well as private donations of all sizes. Upon information and belief, Defendant BPLS is engaged in the business of, among other undertakings, acquiring, warehousing, preserving, and making available for public consumption books, periodicals, videos, audio recordings, films, photographs, works of art, and other media materials, as well as presenting public shows and educational offerings that are economically and experientially accessible to varying levels of Brooklyn residents and visitors. Upon information and belief, at all relevant times, Defendant BPLS has had its principal place of business at Grand Army Plaza in the Borough of Brooklyn, in the City and State of New York.

9.    Defendant Weiss, upon information and belief, resides at 1659 47th Street in the Borough of Brooklyn, in the City and State of New York. At all relevant times, Defendant Weiss has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently as an Assistant Manager of Library Services.

10.    Defendant Fortune Cohen, upon information and belief, resides in the Borough of Brooklyn, in the City and State of New York. At all relevant times, Defendant Cohen has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently as a Branch Operation Supervisor.

11.    Defendant Victor Ferrara, upon information and belief, resides in the Borough of Brooklyn, in the City and State of New York. At all relevant times, Defendant Ferrer has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently as a Special Officer.

12.    Defendant Gerald Radioli, upon information and belief, resides in the Borough of Brooklyn, in the City and State of New

York.    At all relevant times, Defendant Radioli has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently as an Assistant Manager of Library Services.

13.    Defendant Mary Maldonado, upon information and belief, resides in the State of New York. At all relevant times, Defendant Maldonado has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently, upon information and belief, as the Manager of Employee Relations for Defendant BPLS.

14.    Defendant Edward Jelen, upon information and belief, resides in New York State. At all relevant times, Defendant Jelen has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently, upon information and belief, as a Cluster Leader.

15.    Defendant Linda Cohen Portera, upon information and belief, resides in New York State. Defendant Cohen Portera (hereinafter "Defendant Portera") has used multiple aliases in her professional career, namely "Linda Cohen," and "Linda Porter." At all relevant times, Defendant Portera has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently, upon information and belief, as the Director of Neighborhood Services for Defendant BPLS.

16.    Defendant William Sennick, upon information and belief, resides in New York State.  Defendant William Sennick (hereinafter "Defendant Sennick"), at all relevant times, has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently, upon information and belief, as a Cluster Leader.

17.    Defendant Dionne Mack-Harvin, upon information and belief, resides in New York State. Defendant Dionne Mack-Harvin (hereinafter "Defendant Mack-Harvin"), at all relevant times, has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently, upon information and belief, as the Executive Director of Defendant BPLS.

18.    Defendant Mary Graham, upon information and belief, resides in New York State.  Defendant Mary Graham (hereinafter

- 4 -

"Defendant Graham"), at all relevant times, has been employed by Defendant BPLS within the Borough of Brooklyn, within the City and State of New York, most recently upon information and belief, as the Deputy Director for Public Service of Defendant BPLS.

19.    As Plaintiff Difilippi's supervisors and managers during the entire period of time relevant hereto, and as agents of Defendant BPLS, Defendants Mack-Harvin, Weiss, Cohen, Portera, Graham, Sennick, Radioli, Maldonado, and Jelen (collectively hereinafter "the Management Defendants") had the power to make personnel decisions regarding Plaintiff Difilippi's employment. The Management Defendants, at the very least, jointly and/or severally intentionally and/or negligently aided and abetted the unlawful conduct described herein. At most, each was jointly and/or severally responsible for intentional and/or negligent acts and/or omissions which were either directly violative of Plaintiff Difilippi's rights (and, by extension, those of Plaintiff Aboelelaa,) or had a violative effect on Plaintiff Difilippi (and by extension, Plaintiff Aboelelaa).

20.    At all relevant times hereto, Defendant BPLS was an "employer" of Plaintiff Difilippi within the meaning of 42 U.S.C.A §§ 2000e et seq.; 42 U.S.C.A. §§ 12101 et seq.; 29 U.S.C.A. §621, et seq.; and all relevant New York state statutes and common laws, including, but not limited to N.Y.C. Admin. Code §§8-107(1)(a) and (15)(a).

## FACTS

21.    Plaintiff Difilippi was born on August 26, 1948 and was above the age of 40 during all times relevant to Defendants' act and/or omissions alleged herein.

22.    Plaintiff Difilippi became employed by Defendant BPLS on August 1, 1983, when she was appointed to the Mapleton Branch of the Brooklyn Public Library located at 1702 60th Street in the Borough of Brooklyn, within the City and State of New York. Plaintiff Difilippi's employment was conditioned upon her promptly completing her graduate equivalency diploma (GED) soon after beginning her new job. In February of 1984, upon successful completion of her GED, Plaintiff Difilippi officially became a clerk with Defendant BPLS .

23.   Plaintiff Difilippi worked diligently over the next several years and received extremely high level performance reviews throughout that time period, which period included a transition to computerization Library System-wide, and a reduction in workforce which, rather than cost Plaintiff Difilippi her job, resulted in her transfer in 1991 to a different branch of the Library, this time to the Boro Park Branch at 12 65 43rd Street in the Borough of Brooklyn, within the City and State of New York.

24.   During this period, Plaintiff Difilippi's reviews remained in a range from satisfactory to significantly above average.

25.   After the budget crunch subsided a few years later, Plaintiff Difilippi was permitted to return to the Mapleton Branch where, because of computer training she had undertaken at her own expense and on her own initiative, Plaintiff Difilippi was able to assist the less computer-sophisticated of her co-workers and supervisors with learning to use computers to create, edit, store, and retrieve finance and payroll reports and several other mission-essential documents. Further, upon her own initiative, and eventually at the formal and informal requests of her supervisors and managers at the time, Plaintiff Difilippi undertook to instruct her co-workers and supervisors in her branch and in others on various then-new software programs necessary to perform their jobs in the Computer Age.

26.   In 1997, Plaintiff Difilippi was promoted to Senior Clerk (now, upon information and belief, referred to as an "Office Associate I"), a promotion which required Plaintiff Difilippi to complete significant additional training (which Plaintiff Difilippi completed, as required) and carried with it considerable additional responsibility.   Plaintiff Difilippi assumed her new responsibilities at the DeKalb Branch in the Borough of Brooklyn, within the City and State of New York.   In her new capacity, Plaintiff Difilippi trained new and otherwise junior clerks.   During the latter part of this time, she and her co-workers were temporarily relocated to the Macon Branch (also in the Borough of Brooklyn, within the City and State of New York) during a renovation of the DeKalb Branch.   While attached to the DeKalb Branch, Plaintiff Difilippi was selected to travel to the state capital at Albany, New York, where she had the

- 6 -

honor of requesting and acquiring special funding on behalf of her adopted home branch.

27.     After two years of working at the DeKalb Branch, Plaintiff Difilippi applied for and was promoted to Office Associate II, and was transferred to the Kings Highway Branch, the second largest branch in the Brooklyn Library System, also in the Borough of Brooklyn, within the City and State of New York.  When she accepted the new position, her co-workers and supervisors affiliated with both Macon and DeKalb Branches united to throw her a going-away party.

28.     In her capacity as an Office Associate II, Plaintiff Difilippi trained and evaluated 13 clerks, and undertook other tasks and assignments which were, to her, both challenging and rewarding.  She managed an annual budget of $64,000 for part-time employees.   Her managers and supervisors at the Kings Highway Branch credit Plaintiff Difilippi with transitioning a collection of disparate individuals into a cohesive and effective team.   Eventually, Plaintiff Difilippi was promoted, within that branch, to the rank of an Office Associate III in 1999.

29.     Plaintiff Difilippi remained at the Kings Highway Branch from 1999 until April of 2004, when she accepted a lateral transfer back to the Boro Park Branch which was closer to her home and which was familiar territory to Plaintiff Difilippi.  When she left the Kings Highway Branch, her co-workers and supervisors took her out to dinner to express their sadness at her departure and to wish her well.

30.     In her new position, Plaintiff Difilippi supervised four probationary clerks ("Article 30" clerks) and trained them through their attaining permanency within the Library System. In this position, Plaintiff Difilippi reported directly to Defendant Sarah Weiss (hereinafter "Defendant Weiss").

31.     In 2005, Defendant BPLS created a new supervisory job category called "Branch Operations Supervisor" (hereinafter "BOS"), a position to which, upon information and belief, any level of library staff could apply.  Plaintiff Difilippi was offered this position at a different branch, but declined because she realized that she would be called upon to be responsible for the physical plant as well as the personnel, assets, and overall operations.  She worried that the love she

had for the Library System might not show as clearly to the public in a job of this type.

32.     Eventually, notwithstanding these reservations, Plaintiff Difilippi accepted an appointment as the BOS of the Boro Park Branch because she loved and admired the branch and because she yearned to be of service to the Library System as a whole.

33.     Upon information and belief, the innovation of the BOS position allowed experienced clerks (including Office Associates) to exercise mission-specific authority over the generally better-educated librarians, often creating significant tension at the branch level. The Boro Park Branch, unfortunately, was an paradigmatic example of this trend. Despite significant efforts by Plaintiff Difilippi to continue to work well with Defendant Weiss and to continue to approach her job in a discreet, but efficient manner, Defendant Weiss became immediately threatened by Plaintiff Difilippi's appropriate exercise of her authority as the BOS of the Boro Park Branch. Upon information and belief, as a direct and/or proximate outcome of her threatened professional ego, Defendant Weiss undertook to make Plaintiff Difilippi's working life as miserable and onerous as Defendant Weiss' own authority would permit. Among many other inappropriate undertakings, Defendant Weiss often openly and notoriously undermined Plaintiff Difilippi's authority with the clerks who reported to Plaintiff Difilippi, which clerks were essential to Plaintiff Difilippi's work accomplishment.

34.     During this same period, Defendant Weiss became aware of Plaintiff Difilippi's 1999 marriage to a religious Muslim man, Plaintiff Aboelelaa, and Plaintiff Difilippi's own subsequent conversion to Islam. In preparation for an upcoming trip to Plaintiff Aboelelaa's homeland of Egypt and to strengthen her marriage, Plaintiff Difilippi joined with a co-worker, Jay Taubman (a religious Jew) and the two used their break time to study the Arabic language utilizing the resources available in the Branch.

35.     At no time did Plaintiff Difilippi or her co-worker Mr. Taubman use Library time, inappropriately utilize Library resources, or conduct themselves in a distracting or unprofessional manner either before patrons or otherwise. Upon information and belief, Defendant Weiss who is (upon information

and belief,) a Hasidic Jew, objected to the Arabic study and to the open discussion of Arab and/or Muslim topics on religious and ethnic grounds. Her disapproval of Plaintiff Difilippi's participation in the language study was palpable and was often demonstrated through openly passive-aggressive behaviors immediately following these study sessions, behaviors which she demonstrated against Plaintiff Difilippi in the presence of co-workers, other supervisors, and patrons.

36. Further, when Plaintiff Difilippi, in the legitimate execution of her job responsibilities, sought to diversify the Branch's cultural holdings, by among otter efforts, increasing the number and variety of Arabic and Muslim titles and holdings in the Branch collection, Defendant Weiss commented "No Arabs ever come here. We don't need Arabic books." In response to Defendant Weiss's shocking closed-mindedness, Plaintiff Difilippi contacted Maria Fung, head of the World Language Department of Defendant BPLS, who sent the requested materials anyway. Defendant Weiss's discomfiture with this outcome was palpable and her tactics became more aggressive and targeted against Plaintiff Difilippi.

37. Another example (of Defendant Weiss's open hostility toward Plaintiff Difilippi and Plaintiff Difilippi's support of, among other communities, those who embraced Islam and/or claimed an ethnic affiliation with the Arab and/or Muslim population in and around the Boro Park Branch) involved several part-time employees who happened to profess an Islamic faith. In her role as BOS for the Boro Park Branch, Plaintiff Difilippi permitted several part-time employees to observe the Muslim prayer traditions at the Branch, so long as their practices were not obtrusive or distractive. Defendant Weiss was angry about this permission, but rather than to blatantly discourage the practices, Defendant Weiss would walk through the area while the prayers were taking place and would say "Speak English" to the practitioners.

38. As a result of Plaintiff Difilippi's efforts, and notwithstanding Defendant Weiss's contrarian efforts, the Muslim and Arab patronages at the Boro Park Branch began to increase (although not, upon information and belief, to the detriment of any others of the many populations served by the Branch). Rather than celebrating Plaintiff Difilippi's successful marketing to these previously underserved groups, and the

Branch's services as a whole, Defendant Weiss grew concerned at this development and resisted serving those patrons she believed to be Arab or Muslim. She also made disparaging remarks to Plaintiff Difilippi in front of others about Islam being at the heart of the terrorist attacks of September 11, 2001.

39.    On numerous occasions, Defendant Weiss would exercise her authority over Plaintiff Difilippi by yelling at her threateningly in the presence of other employees, including those directly supervised by Plaintiff Difilippi, and in the presence of Library patrons.

40.    Defendant Weiss's depreciation, diminishment, and deprecation of Plaintiff Difilippi's value to the Branch and to the Library as a whole caused Plaintiff Difilippi such stress and torment that Plaintiff Difilippi also began to suffer outside of the confines of her normal workday, and her suffering began to take a toll on her marriage to Plaintiff Aboelelaa.

41.    At this time, Plaintiff Difilippi made several impassioned pleas to the Library administration, namely Defendants Maldonado and Sennick for help. Instead of offering her any assistance with a professional situation where their intervention, job responsibility and ostensible expertise were clearly implicated, Defendants Maldonado and Sennick did almost nothing to restore order or to protect Plaintiff Difilippi's rights. What little they did do amounted to a thinly-veiled threat--Plaintiff Difilippi and Defendant Weiss were instructed to either get along or both be removed from the Boro Park Branch.

42.    On July 1, 2006, the Library administration made good on its threat and "temporarily" removed both Plaintiff Difilippi and Defendant Weiss from the branch. Two weeks later, notwithstanding Defendants Maldonado's and Sennick's implied assurance of impartiality, without any apparent investigation, and with no explanation to Plaintiff Difilippi, Defendant Weiss was permitted to return to the branch in her same role as before the temporary removal, but Plaintiff Difilippi was offered a demotion and was only allowed to remain an employee of Defendant BPLS if she agreed in writing to the stipulation that she could not return to the Boro Park Branch for one year. After a series of hearings involving Plaintiff Difilippi, Plaintiff Difilippi's union, Defendant BPLS, during which time Plaintiff Difilippi worked at the Mapleton Branch, she was offered a range of

branches where she could go and continue her career as the BOS. Recognizing the disastrous effect that the BOS position had had on her career and her previously peaceable co-existence with her fellow employees of Defendant BPLS, she declined these offers, and requested to be returned to her previous Office Associate III responsibilities. This request was granted, but she was forced to remain banished to the Mapleton Branch. She was not permitted to return professionally to the Boro Park Branch.

43. Around the same time period, Plaintiff Difilippi, who had come to rely upon Defendant BPLS's previously generous overtime policy to supplement her meager base pay, was expressly forbidden by members of the Management Defendants to work Sundays at the Mapleton Branch. She was ostensibly permitted to work Sundays in support of other branches, but this "permission" only came after all other local branches' Sunday rosters were full. Upon information and belief, these policies were instituted to cause financial hardship and further create stress in the lives of Plaintiff Difilippi and Plaintiff Aboelelaa.

44. During the time of her tribulations with Defendant Weiss at the Boro Park Branch, Plaintiff Difilippi had begun to experience a series of personal and emotional problems (which were later diagnosed as an onset of clinical depression with paranoid features), upon information and belief, in response to the stress applied to her by Defendant Weiss and Defendant BPLS. To the extent that Plaintiff Difilippi's conduct became and ever was "erratic," it clearly was not in keeping with the high standards that Plaintiff Difilippi had exhibited in more than two decades of successful service as a library employee and should have garnered her the basic human respect and dignity usually conferred on long-standing members of a team. Far from offering her help, advice, or compassion, Plaintiff Difilippi's co-workers and supervisors, including Defendant Weiss, began to treat her with the utmost contempt and disdain. They began ridiculing her, calling her names, and undertaking to embarrass her in front of the library patrons. She was often referred to openly as "that crazy old bitch," and other such offensive epitaphs between and among co-workers, supervisors, and library patrons. Although Defendant Weiss, upon information and belief, knew of the considerable disrespect and ridicule Plaintiff Difilippi encountered daily, far from putting a halt to such inappropriate workplace treatment, Defendant Weiss instigated it and made efforts to keep it going.

45.    When Plaintiff Difilippi returned to the Mapleton Branch, , to her supreme dismay, she began to notice that, unlike most of the other branches where (in her experience) the rules were generally followed and policy was generally maintained, this branch was staffed by personnel who exhibited a blatant disregard for the rules, and was headed by a BOS, Defendant Cohen, who seemed to think this attitude was okay. For example, there were employees who knitted at their workstations, others who cheated on their timesheets, and still others who slept in front of the patrons.

46.    Although as a long-standing, committed Library employee, and as a Mapleton Branch alum, Plaintiff Difilippi did not immediately set out to cause any of them to worry about her loyalty to her adopted team, more than 20 years on the job had endowed her with a strong work ethic, so she threw herself into her work. During this same time period, despite having attained a level of Office Associate III and having more than 23 years of library experience, Plaintiff Difilippi was instructed by the Management Defendant not to assume any supervisory responsibility over any Branch employees or Branch operations. Notwithstanding the less-optimal work environs, the humiliation Plaintiff Difilippi experienced as a result of the narrowing of her job responsibilities and her authority, and the open hostility toward her, Plaintiff Difilippi continued to work hard at all tasks that were assigned to her.

47.    This dedication to duty caused her alienation from her less dedicated co-workers at the Mapleton Branch. Their contempt manifest itself in ever more heinous ways. For example, in approximately the summer of 2007, while Plaintiff Difilippi was speaking with a co-worker in the break room, a special officer, Defendant Victor Ferrer, came up behind her and, with a knife in his hand, began to pantomime stabbing Plaintiff Difilippi to death. Plaintiff Difilippi turned just in time to see the knife and to recognize what was going on. Upon information and belief, Defendant Victor Ferrer's knife assault gained him such popularity with Plaintiff Difilippi's other co-workers that they endowed him with the nickname "Victor 'The Knife'", further exacerbating Plaintiff Difilippi's humiliation and isolation.

48.    During approximately the same time period, another co-worker, Defendant Radioli, a supervisor, perhaps angry that

- 12 -

Plaintiff Difilippi had had to wake him up at his workstation on multiple occasions to get his assistance with patron requests, made obscene gestures at her (i.e., giving her "the finger") in front of library patrons.    Upon information and belief, Defendant Radioli's reputation for sleeping on the job, a repeated infraction for which he was never disciplined, was so well known and such incidents happened with such frequency that staff and patrons sometimes referred to him by the nickname "The Sleeping Librarian."

49.    Additionally, Plaintiff Difilippi, upon transitioning to the Mapleton branch, was not paid her salary over the course of several pay periods because, despite her repeated requests to the Management Defendants, no one would assist Plaintiff Difilippi in getting onto the appropriate roster so that she could get paid as scheduled.    Although she was eventually paid the full amount then-owing (without interest), the Defendants' delay in compensating her placed a tremendous financial, emotional and psychological burden on Plaintiff Difilippi and on her already fragile marriage to Plaintiff Aboelelaa brought on by her constant work-induced stress.

50.    When Plaintiff Difilippi brought these and other activities to the attention of the BOS at that branch, Defendant Cohen, rather than to receive support, compassion, or understanding, Plaintiff Difilippi received further contempt. And rather than to have her co-workers admonished or disciplined for their indiscretions against Plaintiff Difilippi, their actions were celebrated by Defendant Cohen and others as appropriately humorous for the workplace.    Again, impassioned pleas to the administration at Defendant BPLS, namely Defendants Jelen, Portera, and Maldonado, nothing was done to improve the situation, no disciplinary actions taken nor any attempts made to administer to Plaintiff Difilippi's mental, emotional, and/or physical needs.

51.    Defendant Cohen, in addition to her omissions to perform her job in a manner most conducive to the best interests of Branch operations, Defendant BPLS, and/or Plaintiff Difilippi, also undertook to engage in intentionally outrageous conduct which led directly to harm to both Plaintiffs Difilippi and Aboelelaa.    Among other actions, she granted Plaintiff Difilippi written permission to take off a number of personal days (for which Plaintiff Difilippi never attempted to

inappropriately collect compensation and, in fact, never inappropriately received compensation) and then cited those same days as unexcused absences in an employment evaluation of Plaintiff Difilippi's work performance.    Upon information and belief, Defendant Cohen engaged in this surreptitious and egregious conduct in an effort to further derail Plaintiff Difilippi's career and her mental, emotional, physical, and marital health.

52.    As she continued to struggle to get along with her co-workers and supervisors at the Mapleton Branch, Plaintiff Difilippi's mental health began to further deteriorate.    She began to have episodes where she would cry openly at work but was never comforted by any of her co-workers, least of all, the Individual Defendants, although patrons were, as always, generous with their moral support to Plaintiff Difilippi.    In fact, no advice or assistance was ever offered to her, by any of the Management Defendants, even though it was clear that the long-term employee Defendant BPLS had known for more than 23 years was attempting to endure a personal crisis.    Instead of assisting her in any meaningful way, various of these Defendants wrote Plaintiff Difilippi up for her "erratic" behavior.    No workplace stress counseling or employee assistance program was ever offered or advised.

53.    As a result of such invidious, notorious, open, and hostile workplace treatment, naturally, as Plaintiff Difilippi's mental and emotional health became less stable, and as her physical health began to likewise decline, the impact on her marriage to Plaintiff Aboelelaa became profound. Notwithstanding Plaintiff Aboelelaa's best efforts to soothe his wife's hurt feelings, disappointment and anger, arguments became unavoidable and the survival and continued health of their marriage and their friendship came into significant doubt. Their marital sexual relations, previously healthy and robust, became nonexistent.    Their desire and ability to enjoy each other's company diminished.    Plaintiff Aboelelaa's ability to rely on his Plaintiff Difilippi's emotional, conversational, logistical, and other contributions to their relationship dissolved almost entirely as her mind and body were taken over by the effects of stress-induced mental and physical illnesses.

54.    As Plaintiff Difilippi realized that her problems with her co-workers and with Defendant Cohen were beyond those which

could be adequately addressed at the Branch, she continued repeatedly to appeal to the Library administration for intervention. Instead of offering her any help, the administration, namely Defendants Mack-Harvin, Graham, Maldonado, Jelen, and Portera, on behalf of Defendant BPLS, took the extreme step of trying to rid themselves of Plaintiff Difilippi. On August 27, 2007, one day after her 59th birthday, Defendant BPLS placed Plaintiff Difilippi on leave with pay for two weeks, after which they forced her onto leave with no pay and attempted to terminate her without benefit of the retirement program into which she had paid for her entire 24-year career. After intervention by her union officers and an attorney whom Plaintiff Difilippi retained for the purpose (at great expense to herself and her husband, Plaintiff Aboelelaa, she was "permitted" to retire. Her retirement was effective on October 19, 2007. She was 59 years old at the time of her forced retirement. She had originally intended to retire at age 62.

55. Plaintiff Difilippi and Plaintiff Aboelelaa remain married and are successfully working toward a resurgence in their marriage now that the initial stress that placed the marriage in jeopardy has largely subsided. However, the stress of having to survive on a substantially reduced income for Plaintiff Difilippi, and the dim prospects that she will be able to replace her previous earnings and level of responsibility and respectability have permanently created a situation of tremendous economic disadvantage for the couple.

56. Plaintiff Difilippi will never fully recover from the torturous suffering she has endured, from the loss to her sense of personhood and to her personal and professional reputation, and from the supreme distress of watching her beloved husband Plaintiff Aboelelaa's health decline as a result of the ordeal they have together experienced because of the acts and omissions of the Defendants. Neither will Plaintiff Difilippi ever be able to recreate the lost enjoyment of her marriage to Plaintiff Aboelelaa which she and Plaintiff Aboelelaa had to countenance because of those same acts and omissions, and because of the resulting and residual stress they placed upon them both.

57. Further, Plaintiff Aboelelaa, whose cardiac and respiratory health have declined amidst the marital strain and the torturous suffering he watched his beloved wife endure at the conclusion of her treasured library career, will never fully

- 15 -

recover from the ravages his mental and physical health have incurred as a result of the aforementioned acts and omissions against him and Plaintiff Difilippi. Further, Plaintiff Aboelelaa will never be able to recreate the lost enjoyment of his marriage to Plaintiff Difilippi which he and Plaintiff Difilippi had to countenance because of those same acts and omissions, and because of the resulting and residual stress they placed upon them both.

## PROCEDURAL REQUIREMENTS

58.    Plaintiff Difilippi has appropriately filed a charge (EEOC Charge# 520-2008-00766) with the Equal Employment Opportunity Commission and received a so-called "right-to-sue letter" on February 8, 2008.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS BPLS, WEISS, COHEN, RADIOLI, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Discrimination against Plaintiff Difilippi under ADEA

59.    Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through 58 above.

60.    Plaintiff Difilippi has been discriminated against by the Defendants on the basis of her age in violation of the Age Discrimination in Employment Act (29 U.S.C.A. §621, et seq.) by defendant's engaging in a course of conduct which included: Calling her, and permitting co-workers to call her "that crazy old bitch" in front of patrons and between and among themselves, refusing to permit her to use staff clerks and personnel to move large quantities of heavy books and materials throughout the library and among branch locations while making thinly-veiled references to her being too old to handle the job, and pressuring her to either retire or to lose her retirement benefits by accepting termination.

61.    While Defendant BPLS was in the process of terminating, and eventually forcibly retiring Plaintiff Difilippi, younger workers were retained and permitted to retain their positions, despite that many of them lacked the capability, education, and experience exhibited by Plaintiff Difilippi.

62.    Defendant BPLS was possessing, at all relevant times, a complete knowledge of, or reckless indifference to the laws governing its unlawful conduct.  Additionally, the Defendant exhibited a complete reckless disregard for the impact their outrageous actions and egregious omissions would have on Plaintiff Difilippi's and Plaintiff Aboelelaa's increasingly fragile emotional, psychological, physical, marital, and financial well-being.

63.    Plaintiff Difilippi has been unable, despite reasonable efforts, to find comparable employment.  Upon information and belief, the Defendants undertook to prevent Plaintiff Difilippi from attaining such employment. Consequently, she and her husband, Plaintiff Aboelelaa, have been forced to endure a compromised standard of living because of the substantially reduced income they now receive.

64.    Further, because the length of time that Plaintiff Difilippi was permitted to contribute to her retirement compensation program, as well as the amount she was able to contribute without withdrawing against the balance, was significantly reduced by Defendant BPLS's forcibly retiring Plaintiff Difilippi.

65.    The result of these reductions is that the pool of money which Plaintiff Difilippi and Plaintiff Aboelelaa had anticipated to support their household until Plaintiff Difilippi's eventual demise is of tremendously diminished size and value and will not, without a favorable judgment of this Court, ever be restored to its likely eventual amount.

66.    As a proximate result of the foregoing, Plaintiff Difilippi has been denied employment; has lost wages, benefits, promotional opportunities and bonuses; has had her retirement benefits substantially reduced; and has incurred damages thereby.

AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS BPLS, WEISS, COHEN, RADIOLI, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Discrimination against Plaintiff Difilippi
### under ADA

67.    Plaintiff Difilippi hereby repeats and realleges each allegation contained in paragraphs 1 through 66 above.

68.    Beginning in approximately early 2006, Plaintiff Difilippi, under extreme duress from her work at the Boro Park Branch, owing to, among others, the inappropriate actions and omissions of Defendant Weiss and her employees and fellow supervisors, Plaintiff Difilippi began to experience mental and emotional issues that were, until such time, unfamiliar to her. These mental and emotional issues, which Defendant BPLS claims resulted in erratic behavior while Plaintiff Difilippi was working therefore, was later diagnosed by a series of medical doctors as clinical depression with paranoid features.

69.    When Plaintiff Difilippi transitioned to the Mapleton Branch in late 2006, Defendant Fortune Cohen took it upon herself to perpetuate the cycle of discriminatory and disrespectful treatment.

70.    Based upon Plaintiff Difilippi's extensive history of positive reviews and increasing levels of formal and informal responsibilities within Defendant BPLS's organization, and Plaintiff Difilippi's series of promotions and merit raises, the Defendants knew, or should have known, that any such "erratic" behavior was atypical and likely symptomatic of profound personal or psychological problems.    Additionally, upon recognizing that Plaintiff Difilippi was beginning to suffer from such issues, Defendants knew, or should have known that they had a legal obligation to address such sudden resulting inconsistencies in Plaintiff Difilippi's work pursuant to and in concert with the laws governing labor and employment issues wherein disabilities are manifest and accommodations are implicated. All Defendants failed to do so, resorting instead to ridicule, name calling, assaults on her person, defamation, and administrative measures, all designed to deprive Plaintiff Difilippi of her ability to recover and of her legal and constitutional rights to be treated by her employer with dignity and respect.

71.    The rapport that Plaintiff Difilippi had developed with the library attending public, over her then 23-year legacy of service to that public, was severely compromised when the Defendants failed to handle this situation appropriately and in accordance with federal and state laws.

72.    Had any member of Defendant BPLS's management team taken the time to constructively point out Plaintiff Difilippi's inconsistencies, advise her to seek medical or psychological

attention, and/or offer her paid or unpaid time off to seek the medical or psychological help that she may have needed, Plaintiff Difilippi would likely have accepted such a kind offer of assistance. Instead, she was forced to spar daily with co-workers, managers, and supervisors who seemed to take perverted pleasure in exacerbating her dangerously fragile mental state. When these parties, all agents, employees, and managers of Defendant BPLS, grew tired of toying with Plaintiff Difilippi, they still did not offer her any compassionate, or at minimum, legally-required accommodation or assistance, but rather tried twice to fire her, attempted to deprive her of her retirement program, and finally, eventually forcing Plaintiff Difilippi to retire two months after her 59th birthday.

73.    In the time following her forced retirement, Plaintiff Difilippi's condition has been completely managed with the aid of psychologists and prescribed medications, measures which she undertook when her family, upon realizing that she was being forced to retire because of "increasingly erratic behavior" encouraged her to get the help that she needs. Had the Defendants so intervened, it is entirely likely that Plaintiff Difilippi could have finished her long career as an employee and supervisor with Defendant BPLS on a more befitting "high" note, instead of having to struggle with the sense of loss that is at the heart of this instant litigation.

74.    Plaintiff Difilippi has made giant strides, in the time since she was forced to retire. She has now nearly recovered mentally and emotionally and has largely overcome her mental disability with the aid of doctors and prescription medications. She still has been unable, despite reasonable efforts, to find comparable employment. Upon information and belief, the Defendants undertook to prevent Plaintiff Difilippi from attaining such employment.

75.    As a proximate result of the Defendants' discrimination against Plaintiff Difilippi on the basis of her disability (or a record or a perception of disability), Plaintiff Difilippi has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, substantial value in her retirement program (owing to interest compounding and lost contributions) and other employment benefits.

76.    As a further proximate result of the Defendants' actions, Plaintiff Difilippi has suffered and continues to suffer impairment and damage to Plaintiff Difilippi's good name and reputation by the Defendants.

77.    As a further proximate result of the Defendants' actions, Plaintiff Difilippi has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

78.    The conduct of the Defendants was outrageous and malicious, was intended to injure plaintiff, and was done with reckless indifference to Plaintiff Difilippi's protected civil rights, entitling Plaintiff Difilippi to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS BPLS AND WEISS, ALONG WITH JOHN DOES NUMBERED 1-25

### Discrimination on Basis of Religion against Plaintiff Difilippi under Title VII

79.    Plaintiff Difilippi hereby repeats and realleges each allegation contained in paragraphs 1 through 78 above.

80.    As a proximate result of the Defendants' religious discrimination against Plaintiff Difilippi, Plaintiff Difilippi has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

81.    As a further proximate result of the Defendants' actions, Plaintiff Difilippi has suffered and continues to suffer impairment and damage to Plaintiff Difilippi's good name and reputation.

82.    As a further proximate result of Defendants' actions taken because of Plaintiff Difilippi's religion, Plaintiff Difilippi has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses. The conduct of Defendant Weiss was outrageous and malicious, was intended to injure Plaintiff Difilippi, and was done with reckless indifference to Plaintiff Difilippi's protected civil rights, entitling Plaintiff Difilippi to an award of punitive damages.

83.    As Defendant BPLS attempted to terminate and eventually forcibly retired Plaintiff Difilippi, Plaintiff Difilippi has been unable, despite reasonable efforts, to find comparable employment.    Upon information and belief, the Defendants undertook to prevent Plaintiff Difilippi from attaining such employment.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS, COHEN, FERRER, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Assault against Plaintiff Difilippi under New York State Common Law

84.    Plaintiff Difilippi hereby repeats and realleges each allegation contained in paragraphs 1 through 83, as if fully set forth herein.

85.    In approximately the summer of 2007, while Plaintiff Difilippi was speaking with a co-worker in the break room, Defendant Victor Ferrer a special officer, an agent of Defendant BPLS, came up behind her and, with a knife in his hand, began to pantomime stabbing Plaintiff Difilippi to death.    Plaintiff Difilippi turned just in time to see the knife and to recognize what was going on.

86.    While Defendant Victor Ferrer later claimed that he intended his actions in jest, his actions were unreasonable and outrageous under the circumstances and placed Plaintiff Difilippi in fear for her own safety as she reasonably believed that she was about to be stabbed by the officer.

87.    As if to further exacerbate the physical and emotional fear and embarrassment, the employees and supervisors of the Mapleton Branch began to refer to Defendant Victor Ferrer by the nickname "Victor the Knife," a practice from which Defendant Victor Ferrer's popularity and reputation benefitted and which Defendant Victor Ferrer himself encouraged.

88.    As a result of the foregoing, Plaintiff Difilippi has been unreasonably harmed by Defendant Victor Ferrer's outrageous conduct, and by Defendant BPLS's refusal to correct the situation in any meaningful way, and Plaintiff Difilippi has incurred damages thereby.

AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS,
COHEN, FERRER, MALDONADO, JELEN, PORTERA, SENNICK, MACK-
HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Battery against Plaintiff Difilippi under
### New York State Common Law

89.    Plaintiff Difilippi hereby repeats and realleges each
allegation contained in paragraphs 1 through 88, as if fully set
forth herein.

90.    As a result of the foregoing, Plaintiff Difilippi has
been unreasonably placed in fear of immediate harm to her person
based upon Defendant Victor Ferrer's outrageous conduct,
Defendant Fortune Cohen's refusal to adequately address said
conduct upon being made aware.  Plaintiff Difilippi has incurred
damages thereby.

AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS,
WEISS, COHEN, RADIOLI, FERRER, MALDONADO, JELEN, PORTERA,
SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES
NUMBERED 1-25

### Defamation and Defamation Per Se against
### Plaintiff Difilippi under New York State
### Common Law

91.    Plaintiff Difilippi hereby repeats and realleges each
allegation contained in paragraphs 1 through 90, as if fully set
forth herein.

92.    In calling Plaintiff Difilippi, and allowing her to be
called, a "crazy old bitch" on various occasions beginning in
July 2006 and continuing until the termination of Plaintiff
Difilippi's employment and her forced retirement, Defendant BPLS
and its agents (namely Defendants Cohen, Radioli, Maldonado,
Jelen, and Portera, all of whom were aware of the name-calling
and other manifest disrespect, and all of whom had an obligation
to stop or control such conduct, and none of whom did) have
caused significant damage to the professional and personal
reputation cultivated by Plaintiff Difilippi over the course of
her 24-year library career.

93.    In casting her in an unfair and false light, the
Defendants have caused Plaintiff Difilippi to become the object
of ridicule among her co-workers, fellow supervisors, managers,
and members of the library patron public.  In disparaging her

work, they have ruined her professional marketability and rendered her virtually unemployable in the field which she faithfully served for nearly a quarter of a century.

94. Additionally, Defendant BPLS, through its agents' intentionally outrageous and/or negligently injurious conduct has caused Plaintiff Difilippi to worry that each person she encounters outside of the Library environment might be a person who has heard of her through her work and might, therefore be someone who unfairly judges her harshly on the basis of Defendants' representations about her.

95. Further, Defendant BPLS's negligent supervision of its agents, employees, managers, and supervisors permitted these persons to individually and collectively subject Plaintiff Difilippi to such ridicule between them and/or in front of the library patrons as to cause Plaintiff Difilippi such damage that her mental, emotional, and psychological health, in addition to her physical health, were substantially compromised and have failed to fully recover and, indeed may never fully recover.

96. As a result of the foregoing conduct, Plaintiff Difilippi has suffered financial, mental, and emotional injury, and has incurred actual and special damages thereby.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS, WEISS, COHEN, RADIOLI, FERRER, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Intentional and/or Negligent Infliction of Emotional Distress against Plaintiff Difilippi under New York State Common Law

97. Plaintiff Difilippi hereby repeats and realleges each allegation contained in paragraphs 1 through 96, as if fully set forth herein.

98. Defendants, through their intentionally outrageous and/or negligently injurious conduct and their omissions, have undertaken to systematically destroy the very fabric of Plaintiff Difilippi's life, marriage, and livelihood, causing her discomfort, fear, sadness, panic, anger, depression, loss of joy, loss of love, severe distrust of others (including her husband and best friend Plaintiff Aboelelaa), and alienation from the rest of the community. Despite being aware of her

increasingly fragile mental state, they further undertook to push her to a point where a mental and emotional breakdown was not merely possible, but indeed became likely, and then they sought to punish her for the resulting breakdown by first trying to terminate her employment without the benefit of her retirement compensation and then, failing that, forcing her to retire early and to accept a substandard retirement compensation. There is no way to adequately estimate the extent of the psychic, physical, and emotional damage wrought by these joint and several tortfeasors, Defendants.

99.    As a result of the foregoing egregious, outrageous, and negligent conduct, Plaintiff Difilippi has suffered severe emotional distress, and has incurred substantial damages thereby.

### AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS, WEISS, COHEN, RADIOLI, FERRER, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

#### Prima Facie Tort against Plaintiff Difilippi under New York State Common Law

100.    Plaintiff Difilippi hereby realleges each allegation contained in paragraphs 1 through 99, as if fully set forth herein.

101.    By Defendants Weiss, Cohen, Radioli, and Ferrer's actions and omissions, conducted while each was an agent of Defendant BPLS, Plaintiff Difilippi was forever damaged psychically, emotionally, cognitively, physically, financially, maritally, religiously, professionally, and reputationally. These actions and omissions by the Defendants, none of which were undertaken to advance any legitimate business purpose, motive, excuse, or justification, were done overtly and with malice, and were intended to cause, and, in fact, did cause Plaintiff Difilippi harm.

102.    As a result of the foregoing malevolent conduct and failures to act in accordance with their legal, ethical, professional, moral, and contractual responsibilities, Defendant have caused Plaintiff Difilippi to suffer harm, and to incur actual and special damages thereby.

- 24 -

AS AND FOR A NINTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS,
WEISS, COHEN, RADIOLI, FERRER, MALDONADO, JELEN, PORTERA,
SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES
NUMBERED 1-25

### Failure to Make Reasonable Accommodation for
### Plaintiff Difilippi under New York City
### Human Rights Law

103.    Plaintiff hereby repeats and realleges each allegation
contained in paragraphs 1 through 102, as if fully set forth
herein.

104.    The Defendants knew, or with reasonable diligence and
care should have known, that in approximately 2005, Plaintiff
Difilippi had begun to experience mental, emotional, and related
physical issues which comprised a legitimate disability and
entitled Plaintiff Difilippi, under the laws of the State of New
York, to accommodations, including, but not limited to, reduced
or revised work duties, assistance with tasks which, by virtue
of her disability, are more burdensome than they might be for
someone not similarly afflicted, and an employee assistance
mental health counseling program (which, upon information and
belief, existed, but was never advocated to Plaintiff Difilippi
by the Defendants, who chose, instead to continue their cycle of
discriminatory and ultimately injurious acts and omissions.
Additionally, although Plaintiff Difilippi had seniority and
carried a senior title (Office Associate III), rather than make
accommodations for her disability so as to avoid discrimination
against her, Defendant Portera created a policy of denying
Plaintiff Difilippi the opportunity to work lucrative Sunday
overtime hours, thereby further creating a financial hardship in
the household of Plaintiff Difilippi, and further exacerbating
the damaging stressful effects on Plaintiff Difilippi's marriage
to Plaintiff Aboelelaa.

105.    Plaintiff    Difilippi    has    been    unable,    despite
reasonable efforts to find comparable employment and to replace
the lost income and lost overtime revenues.    Upon information
and belief, the Defendants undertook to prevent Plaintiff
Difilippi from attaining such employment.

106.    As a proximate result of the Management Defendants'
and Defendant BPLS's termination of Plaintiff Difilippi's
employment and their adverse employment action against Plaintiff
Difilippi and their failure to make any reasonable accommodation

for her, these Defendants discriminated against Plaintiff Difilippi in violation of the New York City Human Rights Law and caused Plaintiff Difilippi a significant loss of her compensation and benefits, and mental and emotional anguish for which she has incurred substantial damages.

AS AND FOR A TENTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS, WEISS, COHEN, RADIOLI, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Prima Facie Tort against Plaintiff Aboelelaa under New York State Common Law

107.    Plaintiff Aboelelaa hereby realleges each allegation contained in paragraphs 1 through 106, as if fully set forth herein.

108.    Defendant BPLS, through its own intentional and/or negligent acts and/or omission and by and through the intentional and/or negligent acts and/or omissions of its agents, namely the Management Defendants, among others, created such a hostile and discriminatory work environment that its impact on the mental, emotional, and physical health of Plaintiff Difilippi was obvious and immediate.

109.    Such impact was so profound and pronounced that, eventually, Plaintiff Difilippi was unable to leave the residual effects of her workday at work, but rather brought her agitation, fear, hurt, trepidation, distrust, humiliation, sadness, depression, disappointment, and alienation into the home which she shared with Plaintiff Aboelelaa.

110.    These intense emotions, caused and exacerbated by a pattern of continuing and systematic intentional and/or negligent bad acts and egregious omissions, further advanced the declining domestic situation and caused such increased arguments as to make marital sexual relations, friendship, and basic marital enjoyment nearly impossible. When compounded by the increasing effects of the stress-induced mental and emotional disability from which Plaintiff Difilippi had begun suffering, Plaintiff Aboelelaa's quality of life suffered. Plaintiff Aboelelaa's ability to enjoy his marriage to and friendship with Plaintiff Difilippi was diminished so substantially as to be nearly nonexistent.

111.    Further, because of the stress and strain of dealing with Plaintiff Difilippi's suffering, and the conflicts her stress-induced mental, emotional, and physical conditions caused the couple to experience, Plaintiff Aboelelaa's own mental and emotional health began to suffer.    Notably, Plaintiff Aboelelaa's respiratory and cardiac systems began to fail, requiring him to require numerous medical treatments and prescription medications to evade a premature death.    In addition to the physical and emotional toll of coping under such intense circumstances, Plaintiff Aboelelaa incurred significant additional financial obligations because of the necessary medical measures.

112.    Additionally, the financial ramifications of Defendants' intentional and/or negligent acts and/or omissions, namely failing to pay Plaintiff Difilippi for several weeks when she was forcibly transferred to the Mapleton Branch in 2006, refusing to pay her (except through use of her accrued leave time) during an unjust suspension, spontaneously depriving her of lucrative Sunday overtime at the Mapleton Branch and simultaneously creating a scheme which made it impossible for her to earn such overtime at any other local branch, attempting to terminate Plaintiff Difilippi without the benefit of receiving her retirement compensation, and forcibly retiring Plaintiff Difilippi when Union officials and outside attorneys became involved (thereby reducing her income to substantially less than half of its previous state) also placed an almost unbearable strain on Plaintiff Aboelelaa's physical, mental, and emotional health.

113.    Further, the Defendants' defamation and other efforts to diminish Plaintiff Difilippi's professional reputation have effectively made it impossible for Plaintiff Difilippi to ever again earn what she was able to earn at the top of her career.

114.    This loss of future earnings has negatively impacted every aspect of Plaintiff Aboelelaa's life with Plaintiff Difilippi, including, but not limited to: Plaintiff Difilippi's financial contribution to their joint household; Plaintiff Aboelelaa's own ability to scale back his work in deference to his own declining health; Plaintiff Difilippi's and Plaintiff Aboelelaa's ability to travel to Plaintiff Aboelelaa's native Egypt and other various destinations around the world, which travel was a mutual promise they had made during their courtship

when anticipating Plaintiff Difilippi's eventual retirement; and Plaintiff Difilippi's ability to trust in and rely upon anyone, including Plaintiff Aboelelaa, because of the severity of the treatment she has received from Defendants.

115.    As a result of the foregoing malevolent conduct, plaintiff has suffered harm, and has incurred actual and special damages thereby.

### AS AND FOR A ELEVENTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS, WEISS, COHEN, RADIOLI, FERRER, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Intentional Infliction of Emotional Distress against Plaintiff Difilippi under New York State Common Law

116.    Plaintiff Aboelelaa hereby repeats and realleges each allegation contained in paragraphs 1 through 115, as if fully set forth herein.

117.    As a result of the foregoing egregious conduct, Plaintiff Aboelelaa has suffered severe emotional distress, and has incurred damages thereby.

### AS AND FOR A TWELFTH CAUSE OF ACTION AGAINST DEFENDANTS BPLS, WEISS, COHEN, RADIOLI, FERRER, MALDONADO, JELEN, PORTERA, SENNICK, MACK-HARVIN, AND GRAHAM, ALONG WITH JOHN DOES NUMBERED 1-25

### Negligent Infliction of Emotional Distress against Plaintiff Difilippi under New York State Common Law

118.    Plaintiff Aboelelaa hereby repeats and realleges each allegation contained in paragraphs 1 through 117, as if fully set forth herein.

119.    As a result of the foregoing egregious conduct, Plaintiff Aboelelaa has suffered severe emotional distress, and has incurred damages thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Difilippi and Plaintiff Aboelelaa pray that this Court grant judgment to them containing the following relief:

1. Under the ADA, ADEA, and/or Title VII causes of action, an order that Defendants reinstate Plaintiff Difilippi to her former position with full seniority, status, salary increments, bonuses and benefits, to the same extent that she would have received but for Defendants' unlawful conduct;

2. Under the ADA, and/or the NYCHRL Reasonable Accommodation causes of action, an order that Defendants make reasonable accommodation that will allow Plaintiff Difilippi to perform the essential functions of the job;

3. Under the ADA, ADEA, and/or Title VII, and/or the NYCHRL Reasonable Accommodation causes of action, an order prohibiting Defendants from continuing or maintaining the policy, practice and/or custom of denying job benefits to employees on the basis of disability, age and/or religion;

4. Under any and all causes of action enumerated herein, an award to Plaintiff Difilippi of her actual damages, in an amount to be determined at trial, for loss of wages, benefits, and promotional opportunities, including an award of front pay compensating Plaintiff Difilippi for loss of future salary and benefits;

5. Under any and all causes of action enumerated herein, an award to Plaintiffs Difilippi and Aboelelaa of compensatory damages, in an amount to be determined at trial, for the humiliation, mental anguish and emotional distress sustained separately and together by them;

6. Under the ADA, ADEA, and/or Title VII causes of action, an award to Plaintiffs Difilippi and Aboelelaa for punitive damages;

7. Under the ADA, and/or the NYCHRL Reasonable Accommodation causes of action, an order enjoining the Defendants from engaging in the wrongful practices alleged herein and to provide Plaintiff Difilippi with a reasonable accommodation;

8. Under any and all causes of action enumerated herein, an award to Plaintiffs Difilippi and Aboelelaa of the costs of this action, together with their reasonable attorneys' fees; and

9. Under any and all causes of action enumerated herein, such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs Difilippi and Aboelelaa hereby demand a trial by jury as to all issues.

July 9, 2008

Law Offices of Steven E. Savage

By: _____

Steven E. Savage (ses3475)
A Member of the Firm
Attorneys for Plaintiffs Difilippi
and Aboelelaa
P.O. Box 7721
New York, New York 10116 (917) 647-
1813 (office)
(877) 471-2231 (fax)